May it please the court, Kevin Snyder of Civic Justice Institute for International Church of the Fourth Square Gospel and Real Party and Interest Faith Fellowship. There are a number of points in our briefs and each merits the court's attention, but with the court's permission I'd like to first focus my arguments on how this court should come down on interpreting the Arlupa's Equal Terms Provision. There is, as this court is well aware, there is a circuit split and this issue is a matter of first impression for this court. In a recent case from a district court, the issue was framed, I thought, quite well when it says, This is a violation of the Equal Terms Provision present when one or more non-religious assemblies or institutions are afforded better treatment under the terms of a local land-use regulation. The Third Circuit approaches the Equal Terms Provision in this manner. They look to a religious and a secular assemblies and they see if they are similarly situated as to a regulatory purpose. The Seventh Circuit has come out this last year, and it wasn't in our briefs but it was in the supplemental authorities, that they look to religious and secular assemblies and see if they are similarly situated as to regulatory criteria. In sharp contrast, the Eleventh Circuit renders the Equal Terms Provision in a very literal manner. It sees whether or not there is a secular assembly or institution, as that term is defined in the dictionary, and then if it is present and religious assemblies or institutions are not permitted in that area, then there is a violation of the Equal Terms Provision. The Church believes that the Eleventh Circuit's view is the preferred view because it uses the ordinary meaning rule. That has been the preferred canon of construction here in the Ninth Circuit. For example, in San Jose Christian College, this court had its first opportunity to interpret the Arlupa as it relates to religious land-use. In that case, this court had to construe the terms substantial burden, and it used the dictionary and cited the ordinary meaning rule. We believe that this court should, consistent with that canon of construction, interpret the Equal Terms Provision in the same way that it has interpreted the substantial burden provision. Now, moving to the specific facts of this case, how that works its way out. In the present case, the city allows commercial entertainment and recreational uses. Under the city's code, that includes things such as wrestling, musical performance, theatrical, comedy act, televised big-screen events. We believe that that falls under the ordinary meaning of assembly use. The dictionary defines assembly as a company of persons collected in one place, and usually for some common purpose as deliberation, legislation, worship, or social entertainment. So under that rubric, we believe that the city, that these uses are indeed assembly uses, and that, in fact, the church is not permitted and therefore Wouldn't that create an awfully broad definition of assembly? To use the dictionary definition? The way you just defined it. I defined it from the dictionary, and this court used the dictionary for the substantial burden provision. We actually chose a narrower definition by looking at the California Building Code, and that adds a couple of more elements. One is that it has to have a building, it has to have a bottom line of 50 persons, and it gives a couple of extra examples. But for the most part, the California Building Code incorporates the definition found in the dictionary. Let me ask you this. Maybe I should frame my question a different way. What would be the limiting – would there be any limiting – any way of limiting that definition that you just proposed? The California – No, not under the Building Code, under the ordinary dictionary definition. I would think it could be reasonable to say – to do what the Building Code doesn't give a bottom number. Well, how could we come up with a bottom number? I mean, 50, 75, 100? Well, that's why the Building Code came up with 50. I mean, otherwise you could conceivably say that two people having coffee is in assemblies. I don't know that that is under the ordinary understanding. But the question is, is the categories used that a municipality uses, are they generally deemed assembly uses as those terms are commonly understood? And if they are, and religious uses are excluded, then under proper construction – I believe ordinary meaning construction, you would have a violation of equal terms provision. The district court had a very interesting twist on this. It gave the ordinary meaning – it cited San Jose Christian College and gave lip service to that, that you're supposed to use the ordinary meaning rule. However, it then said that the commercial, recreational, and entertainment uses are qualitatively distinct. And the reason, as they said, is because some are for profit and some are non-profit. We believe that that is reading something into the equal terms provision that's not present. If you look at the equal terms provision, it simply says that no government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a non-religious assembly or institution. The lower court's reading is to insert equal terms with a non-profit non-religious assembly or institution. That strays from the ordinary meaning canon of construction. So we believe that that is an error. So if we were to adopt your definition or something similar, what are you asking us to do? Asking you to reverse. Do you get – does that mean you get judgment in your favor? I mean, should summary judgment have been granted in your favor if that's the case? That would be correct. Well, isn't there another step in the analysis that we have to go through? For the equal terms provision, no, there's not. Now, maybe you're thinking in terms of what is the standard of review. Is it compelling interest? I don't know if that's what you're thinking. It's your position that once they show that there's been unequal treatment, you get judgment? Yes, it's checkmate. That's it? Yes. And similarly, you're conceding that there is no question of fact whatsoever in this case. There's no question of material facts. There's interpretations of fact. Well, you know, there's one thing that the city – it's not clear to me, and I don't know how material this is, but the city says, well, you could have – there's other locations within the city of San Leandro. That goes – oh, God, I'm sorry. That primarily goes probably to substantial burden. That's correct. But, you know, and you guys – this church comes back and says, no, no, no. There may be other places, but they're not suitable. If you'd like, I'll switch to substantial burden. No, but I want to make sure I understand your argument. If we agree with your definition or something similar, it's your position that you're entitled to judgment as a matter of law. That's correct. And we believe that's the position of the Eleventh Circuit. It takes the ordinary meaning, canon of construction, and this is what this Court has done. So does that mean that then they have to grant the conditional use permit or do whatever they have to do in order to – Yeah. In this case, it would probably be damages. But that's – yes, that would be it. And the one court has described the equal terms provision as straightforward and sparse. And so, yes, the analysis actually is quite simple. The problem with the Third and Seventh Circuit's analysis is they create these judicial tests that aren't consistent with the text. And so that's the problem with it. If the Court would like, and with the Court's permission, I'd like to move to – I'd like to move to a more substantial burden discussion. We believe that the district court's position is summed up in the following proposition. A neutral law of general applicability is an incidental burden and not a substantial burden because, after all, it's incidental. And that's the syllogism. And, therefore, the only way to get past that is to show animus of some sort or arbitrary or capricious decisions by the local officials. We believe that this is not the correct analysis under this Court's view of Guru Nanak, Guru Nanak's Sikh society. In that case, there was brought by the – by Sutter County the same argument, saying zoning codes are – look facially neutral, and, therefore, this is not an incidental burden. The – this Court said, well, look, if you have individualized assessments, then they are – they are not neutral, generally applicable rules, and, therefore, not incidental burdens. So we believe that the lower courts just simply did not get the analysis correct. And with the Court's permission, I'd like to read one sentence, quote, from the Guru – this Court's decision in Guru. It's land use regulations through zoning codes necessarily involve case-by-case evaluations. And that's at 987 of the opinion. So we believe that the lower courts simply got that analysis wrong. The next issue, though, goes to, so if this is an individualized assessment, was there a showing of a substantial burden? In this instance, the Church gave a very clear discussion of its core tenets and how those theological beliefs are worked out in its religious practices, that it meets each Sunday for worship, evangelism, discipleship. It has a worship service, but it concurrently has Sunday school activities. They have three services, and people switch around, and there's fellowship, discipleship, and that sort of thing. The problem with the lower court is it decided that it would substitute its judgment on what are proper theological and religious exercises for that of the Church. We believe that that is a violation of separation of church and state. The court in Lukumi Babalu-Ai said, "...religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." That's at 531 of the opinion. The lower court stated that the Church had not provided a meaningful reason why it must meet together in one place on Sunday. We would ask, meaningful to whom? To a city council? To a judge? To an unbeliever? To make that very proposition is to show that it's inappropriate under the separation of church and state. I have two minutes. So the city comes back and says, well, not only could they have done this or that, but they also could have found another property. There's also other suitable property. They didn't have to have this one particular piece that they're looking for, correct? That's what the city says. We believe that we have been looking at the other two. Now, there does seem to be a dispute. There does. We believe genuine dispute. There is a dispute. However, they point to two things. They point to the 196 properties overlay. But on 250 of the record, their own declaration says there's only 12 of those that are over. Well. Five acres. And of those, none of the – during the record – course of this case, only one was for sale, and it was under contract. So we would say that we have met the burden of paucity of properties. So in other words, you can't go 196 – it isn't 196, it's 12, and of those, only one for sale. And with the Court's permission, I would like to reserve one minute, unless there is questions that they've – How do you dispose of the one as an alternative? I'm sorry. I didn't understand. You say there was one for sale. How do you – It was – it was under contract. To somebody else. Yes. Is that undisputed? No. It is disputed. It is not a disputed fact that that was – Everybody agrees that it was under contract. Everybody agrees. So you say there were none available. That's our position. There were none available. Well, and this Court said under Guru, citing the Seventh Circuit's St. Helena case, that you don't have to show that there's absolutely nothing available. That's just – that is reading something into the statute. But you have – that is something that helps show a substantial burden. Okay. I'll give you some time for reflection. Thank you. May it please the Court. Deborah Fox of Myers-Naveh for the City of San Leandro. Our LUPA presents many times a precarious balance between making sure an even plating field is provided for those religious facilities who may come to a community and to make sure they are not immunized from land use regulations. In this particular case, there are many interesting issues. First off, counsel cited to your prior decision in the Sutter County case, that case talks about the fact to even get to substantial burden, first you must have an individualized assessment, a particularized assessment as to the property. In this particular case, what the City of San Leandro had done was indeed it had looked at the entire city and adopted an assembly use overlay that it applied to all the commercial industrial properties and decided do these indeed meet these eight criteria. That was not an individualized assessment. I thought they applied – well, go ahead. The eight criteria was set up after San Leandro knew that they wanted to get this property, right? The criteria was indeed examined in the planning process proceeded after the new property had been brought forward. Okay. So you could always make up criteria which looked great and intended to make sure that this property never passes. There is absolutely no evidence that the city – Of course there's not. There wasn't a trial. Well, there was an extensive discovery. There was summary judgment. There were the declarations of the planner about how the eight criteria were formulated and applied throughout the city. And indeed there was also an application for rezoning to add the new site that was proposed by ICFG into the mix of the assembly use overlay. But at no time – and I would offer as well a citation to Guru Nanak where this court said RLUIPA does not apply directly to zoning code amendments. Those are legislative acts. Those are not individualized assessments. So despite all their effort to get permission or whatever they needed from the beginning, which was I guess a – what do you call it, a waiver? What's the word? They needed either a zone change or – Conditional use permit. They never completed and applied for a conditional use permit. Well, they started the whole process of trying to get approval to have their place of worship at this particular location, correct? Yes, they did. And so now it's your position that he never did an individualized assessment when you ultimately denied their application. We didn't deny their application for a CUP as that was what happened. The whole process that the city followed was all brought about by their attempt to get authorization to use this particular building. The process was indeed triggered by that, just like in – And then you come along and you say, well, no, we just passed this general rule, and lo and behold, this one particular place just doesn't make it. That's true. The site indeed was in the IP zone. It was not in the right zone. It was not in one of the 196 properties that were in the assembly use overlay. But moreover, what the ICFG has asked for here is really to pick their own property. They pick a property, and then they say, this is the only property. Of the 196 properties that you claim to be available, how many of them are now churches? There have been no applications on those properties. No, no, those properties – well, you just put this overlay on and said, oh, look, that's good property there, that's good property here. But they're already built out, as you would say. Well, there's a variety of uses that are made in that zone. If I might respond, the city of San Leandro originally only allowed churches and religious facilities in the residential zone, and we have 45 churches there. This was enacted in 2007, and we have not had any applications for religious facilities. Religious facilities like Starbucks and Hallmark card shops and Costco's have to go through the planning process and find a site just like all other uses. Nobody is denying that. All right? Excellent. You have to go through the process. That doesn't mean you have to go through a process guaranteed to make sure that you don't get it. Well, there is absolutely no evidence that there is any sort of gerrymandering of the process here. I don't know. I don't know. The record was fully developed. There were depositions taken, and there is no citation that there was any sort of gerrymandering on behalf of the city of San Leandro to make this site unavailable. Indeed, the record shows that the facility had been a welcome member of the city on its 2.4-acre parcel since 1993. This is an issue when you look at the record on substantial burden. Indeed, the religious facility noted that what its problems were were regulating parking and regulating its allocation of its resources on its campus. It also said it was having problems in serving the homeless, 300 to 400 people on Wednesday nights. These issues of the inconvenience of parking, et cetera, have been found not to rise to the level of substantial burden. We know that from the Midrath, the town of Surfside case that said those folks that have to walk to Temple in the sweltering heat in Miami are not substantially burdened, even though there the evidence showed that these elderly members of the synagogue would not come if, indeed, they had to walk 20 minutes in Miami heat. In this particular case, there has not been a showing that, indeed, the regulations at play here are oppressive. Well, their theology is that they need a meeting in which they're all together in one place at one time. And as was pointed out, it seems as though the district court brushed that aside. Well, we don't debate their theology. But, indeed, if you look at the declaration of Pastor Gary Mortiarty, he says that what they need is they have a number of ministries, they have three Sunday services, but they also have some other ministries and outreaches that incur at other times, including on Wednesday night where they- That's right, but look at the three on Sunday. They want them. They say they're bound to have them at the same time and place. No, I don't believe they do say that, Your Honor. They say that- All right, well, we'll check that. But you dispute the theology, then? No, we do not dispute the theology. The record does not support their claim that everyone needs to be together, that 1,600, 1,700, 2,500 people need to be together at the same time. That was never a claim they made. And, indeed, we offer of their application that was put forward on the new site still proposed three services. They were not to be proposed occurring at one time. I believe that's an argument that evolved when they realized they had not met the level of substantial burden. Okay. Well, we can check that. But that's a good rebuttal. And, indeed, one of the other issues about the marketplace I think is important here. This is not a situation, again, just like in all the cases that this Court has heard on adult uses, Topanga Press, following the Renton case, where the city must find them an available site that's camera-ready to move in. Indeed, I believe that the case of the Chicago Urban Believers is very insightful on that point. There you had five churches that had to find sites within the city of Chicago. It talks there about how all users, including religious facilities, have to deal with the harsh realities of the marketplace. And the only way that you can find that, indeed, there's something inappropriate about those sites, if it is a city-imposed limitation that is burdening the religious facility. Turning briefly to equal terms, because I think that's a very interesting issue here, and counsel made some very interesting statements. First off, there seems to be some notion that it's inappropriate to exclude for-profit facilities from the definition of assembly. I would offer to this Court that, indeed, the case relied on extensively by ICFG, the Midrash case did exactly that. While that case did use the definition from the dictionary, talking about associational purposes, it specifically exempted places primarily for-profit and excluded places that provide service which is customarily carried out as a business. As well, we've cited a number of cases that talk about for planning purposes, it is not somehow improper to want to enhance your redevelopment area, to want to enhance your transit authority. There are a number of cases, indeed, that talk about the propriety of doing so. Midrash failed because in that particular case they allowed lodges while they did not allow religious facilities. Well, how about in this case you allow a commercial recreational activity in the industrial zone? Does that lead to assembly? It would lead to a broad-based notion of assembly, not as we have defined it. Assembly could mean any two or more people gathered at a building. And, indeed, in the lower court, that's what ICFG urged, to use just any people gathered, 50 persons or more. But I think both the Midrash case and the argument that we put forth to Judge Hamilton below was that this assembly has to be coming together for some common purpose. That it isn't the same if you come together to buy a cup of Starbucks in the morning or you come together to go see the latest movie. Why isn't it a common purpose to come and watch a wrestling match? Well, that's a little different. You're paying money, you're not coming together for some associational purpose of a fellowship, to try to either increase your spirituality, perhaps green peace, perhaps world peace. Those are more associational goals of coming together. You also have different land use issues that come into play with commercial facilities and the number of people coming, the times of the event, the intensity of the use. Well, in those terms, in those criteria, why is it a crowd coming to see a wrestling match have a different impact on the environment or transportation or anything else from a crowd going to church? Well, the crowd comes together at different times. They also may be... Let's say they would normally for a wrestling match come sometime during the week. These people come on Sunday, but what difference does that make? It depends on if they're coming during the week, you have more police resources during the week. In the industrial zones where this property is, you have less police resources. Well, I mean, I would suppose the match is probably at night. They wouldn't ordinarily have police there, but they would have to have them. So what else? So I don't think that's much of a difference. Would you give me three criteria that distinguish the crowd for a wrestling match from a crowd at a church service that makes a difference as far as the city goes? A crowd in a wrestling match is generally not coming for an associational purpose. What is the impact difference? The impact is different in that, generally speaking, their times when they come together are different. Now, we said that. They come during the week, they just come later. All right. Difference. What is the difference in the impact? I think there's also a difference in the type of crowd that may come, the preference. Tell us what's the difference in the impact. The presence. A crowd that goes to a wrestling match, a nicer crowd of people or something? Generally speaking, at wrestling matches, although I must confess I have not been to any, but I have the understanding that they serve alcohol, they have additional issues. That's what makes it a better crowd. I think it makes it a different crowd. You have the issue. What's the difference? You have the issue. You're not answering my question. What's the difference in impact on the city or on the industrial zone? If you have a crowd that is coming and you have the service of alcohol, you have increased police issues, public safety issues. All right. So that's worse. That is correct. Those are increased intensity of uses and demands on police services. All right. So that's a worse use than the church use. Fair enough. So you have no difference in impact that you've been able to articulate. I believe I tried to do so. Well, we've gone through them, and it seems to me clear you've not articulated a single one. I've tried my best, Your Honor, to indicate that. I wanted to admit it. You said it's a different time. Yes, obviously. But difference in time doesn't have an impact. Then when we got to the type of crowd, this wrestling crowd is a much heavier burden on the police. So I don't get it. You stack the up at an abstract level, but you're unable to produce any concrete difference in impact. Well, I — It makes the church more obnoxious. Well, I'm not saying that the church is more obnoxious. That isn't the criteria. The notion was that the city can make its determination when it drafts its zoning code as to how it will categorize the uses. It has decided that in the industrial, those particular commercial recreation uses are supposed to serve the industrial, support it, and you need a conditional use permit to get that. And that's a decision that was made years ago by the legislative body. Therefore, the church doesn't serve those purposes, so it's excluded. But the real issue is whether or not it is similarly situated in a place of assembly under the equal terms. Well, you know, the clause we're dealing with is no government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a non-religious assembly or institution. And you say from that, well, you've got to take out all for profit. You don't even think about for profit. I'm saying, first off, I don't. But you just said a few minutes ago before you had your dialogue with Judge Noonan. I am saying that. Right. Why should we interpret it that way, the term assembly within the statute? Because I think that using the common language and the definition of assembly is to come together for an associational purpose. And I don't believe people do that when they come together to watch the Giants games, the Texas Rangers. You made reference to the Eleventh Circuit's decision. And, you know, you're right. They resorted to dictionary definitions. But if you just take their first one, an assembly is a company of persons collected together in one place, usually, and usually for some common purpose as deliberation and legislation, worship, or social entertainment. And then they go on to use Black's Dictionary, a group of persons organizations united for some common purpose. But they do not, in their definition, exclude commercial purposes. While they do not do that, interesting enough, when you look and study the case, they did exclude that. No, they didn't. What they did was they pointed to the zoning ordinance that was at stake there, and they looked at the definition of assembly. And they note that, and it's highlighted in italics in their opinion, according to the zoning ordinance, a private club is a building and facilities or premises owned and operated by a corporation, association of persons, for social, educational, or recreational purposes. They're quoting from the ordinance. And then they just go down and they say, a definition of a private club comports with a natural and ordinary understanding of assembly as a group gathered for a common purpose. My copy of MidDraft is sitting to my right in the box, but my notes indicate that they go on to say, and if you look on the, I believe it's the top of the following page, they talk about the private clubs that are excluded from that definition are primarily for profit and exclude places that provide service. So read in total, indeed, the definition that they found to be sufficient, the stumbling block was simply the use of assembly halls. The stumbling block was not that, indeed, they had excluded from it for-profit businesses. Okay. Thank you. What if we happen to disagree with your, the way you would like us to read or define assembly? What do we do with the case? I think that even if the court disagrees with my definition of assembly, I think whether we use the Eleventh Circuit or the Third Circuit, I think we still, the city still prevails under any of those definitions. Why? Because I think that we have, indeed, shown that there's a variety of support for the classification that was put forth here, that the stumbling blocks that are put forward of the commercial recreation and entertainment are not uses that are allowed as a matter of right. They're just uses that are allowed with a conditional use permit, so that I don't believe this court could say on its face, this ordinance violates the equal terms. If this court- What would we have to do? What would be your position? Of course, my position would be that you would affirm in full, Judge Hamilton, if this court felt that, indeed, the assembly was not in keeping with the equal terms, then I would ask the court to refer it back with direction to the district court- What would you tell the district court to do? To look at the full ramifications of the regulatory purpose and regulatory criteria if there was a particular use that was troubling. Indeed, the issue about the boxing ring, et cetera, none of that was raised below. That really came up when the, I believe it was the Mucus, filed their brief of Calvary Chapel in this particular case. So if we came up with and interpreted the assembly provision and set down some principles, you would say send it back and let the district court apply those to this particular case? Correct. How about on the substantial burden? Is it your position as well that there is, as counsel argued here, that there's no tribal issue effect with regard to other locations? Well, that's a little bit of a conundrum for me because as I see it and from all of the case law in the adult use arena, it seems to me that there was no support from any credible source about the lack of sites. But, indeed, if this court's- The former city manager was not credible? He was not applying as to sites. He was offered some testimony out of context as to the reason why the city decided to add to the residential mix that allowed churches to add more in the industrial, et cetera. So on the site issue, I would say that that would still be a factual determination that would need to be made. I don't think that the church ever put forth any sound evidentiary facts to support that there weren't any sites. What's the strongest argument the city has that it has a compelling interest to exclude the church from the industrial area? That this was its only high-tech industrial zone. It was an area that was supporting and that prior use supported over 400 jobs and that it was its job to balance the land uses within its community. That's the compelling interest? Yes. Thank you. Okay. Rebuttal. My time is very limited, so I'd just like to point to a couple of things in the record. And if there are questions, that's fine as well. One, as far as the CUP completion of that process by the church, that's on page 10 of the record. As to the religious views of the church, I would point to two declarations, and I'll read the two sentences and give you those citations. Each week, dozens of cars are turned away from the manor property. That's a current church property. It has insufficient number of rooms to accommodate the various meetings and activities on Sunday. That's at 703 of the record. Those turned away each Sunday result in a profound theological sense and suffering in the local expression of the body of Christ. That's at 308 of the record. Counsel for the city said that that point was not made to the district court. No, that was hammered clearly in the district court. And, again, those were in the declarations. Those were in oral argument, and they were in the briefings. What she said was that in the application below that you mentioned that there would be three services even at the new location. Yes, and our view is that at each service there are other activities that happen than people Sunday school, Bible studies, fellowship ministry, and people switch around, they fellowship with each other, and they go to these others. Each of those activities, people will perhaps go to more than one, and they incorporate one or more of the church's four essential tenants in each of those activities. So you would say that on an ideal Sunday the whole 1,500 would be in one place or not? On an ideal Sunday, yes. I mean, they have three scheduled services, but during each service, and what I mean by service is a typical sermon, music, and prayer. Concurrently with that, there will be other activities that other portions of the congregation will be engaging in, and then the next traditional service, they will switch around and fellowship, and there will be interaction at that time. Just to clarify. Okay, sure. At any one point, will there be 1,500 people or 500 people? At any one point, currently, and I don't know where this is in the record, but I believe that there is over 1,000 people at the current venue now. At any one time? At any one time, yes. They turn away dozens of cars every Sunday. 1,000 people in the building. Yes, on the campus, yes. But at different services. Pardon me, at different services. Some are in the main service, some are in Sunday school, some are in doing whatever they do. That is correct. And that would be true in the new building. That would be correct as well. You'd be able to accommodate more people. Yes. Part of their theological beliefs is that when they have to turn away people, it's suffering in their body. So it's the turning away of people, not the fact that they're not all in the same room together. The turning, well, they don't have to all be together in, and they're not generally except for once a year in one venue, all of them at one time and sitting together in one room, if that's what you're asking. Yes. Okay, yes. On Easter, they go to the park or some stadium or community college in an auditorium, and they're all physically present in one room sitting together. Otherwise, they're all in the same building each Sunday. Doing different things. Yes, that's correct. Other issues, and I'll close with this, is as far as material facts, the city states on their brief, page 8, that there are no material facts in dispute. Just let me ask you about the commercial aspect of assembly. How do you respond to counsel's argument? That the definitions of that we've provided, that both parties have provided and that courts have provided across the country, don't make this distinction between if you're paying for admission or if this is a nonprofit activity. And so we believe that this is an interpolation into the statute of saying that you compare religious with are they being treated in less than equal terms with other nonprofit religious. That's just not in the statute. Thank you. Thank you. Thank you. Thank you, counsel. The matter will be submitted. We appreciate your arguments. Interesting case.
judges: Duffy, Noonan, Paez